**EMPIRE TRANSPORT, INC., owner of the STEAMSHIP POTOMAC, Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 344, Docket 74–1735.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1975.

Decided July 2, 1975.

Joseph C. Smith, New York City (Burlingham Underwood & Lord, New York City, on the brief), for plaintiff-appellant.

Janis G. Schulmeisters, Atty., Admir. & Ship. Section, Dept. of Justice, New York City (Carla A. Hills, Asst. Atty. Gen., Washington, D. C., Paul J. Curran, U. S. Atty., New York City, Gilbert S. Fleischer, Atty. in Charge, Admir. & Ship. Section, Dept. of Justice, New York City, on the brief), for defendant-appellee.

Before SMITH, OAKES and TIMBERS, *Circuit Judges.*

TIMBERS, *Circuit Judge:*

Empire Transport, Inc., owner of the SS Potomac, appeals from a judgment entered March 26, 1974 after a four day bench trial in the Southern District of New York before Harold R. Tyler, Jr., *District Judge.* The judgment dismissed Empire's complaint which invoked the

admiralty and maritime jurisdiction of the district court pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 741–52 (1970), and sought to recover $1.5 million damages from the United States resulting from the stranding of the Potomac on two large, submerged concrete blocks in Casablanca Harbor, Morocco, on February 26, 1972.

The essential issue on appeal is whether the district court was correct in holding that the stranding of the Potomac resulted from the negligence of her master and watch officer in approaching the harbor and not from the failure of the government's Defense Mapping Agency (DMA) to indicate on its chart of Casablanca Harbor and on other navigational aids the extent of the submerged portion of a jetty and the presence of underwater obstructions where the Potomac stranded. We affirm.

## I.

On the date of the stranding, the Potomac, a bulk cargo vessel 572 feet long with a 75 foot beam, was loaded with a full cargo of wheat to a draft of 33 feet, 5 inches, forward and aft as she approached Casablanca Harbor. The weather was clear. The seas were calm. The wind was out of the southwest at about two knots. There was a slight southwesterly swell at about three to four feet. High tide was at 1244 hours. The Potomac had sent to her agent at Casablanca a marine telegram stating her estimated time of arrival. She was notified in return that a harbor pilot would board the vessel at buoy CA5 to guide her into the harbor. The vessel was advised to stay in contact with the pilot station by radio telephone. She did not do so. As she approached buoy CA5, she changed course and headed to her starboard to avoid colliding with an outbound vessel and local sailboats. The Potomac's watch officer checked the harbor chart which had been prepared by the DMA. He reported that the water was of sufficient depth to leave the buoy to port. As the vessel passed between

the buoy to its port and a jetty to its starboard, she stranded on two large, submerged concrete blocks two-tenths of a mile off the visible end of the jetty. The jetty was known as the Jetee De-Lure.

The DMA harbor chart which the watch officer had checked had been revised in 1966 and was corrected to December 11, 1971 through a Notice to Mariners. The Potomac also had aboard Sailing Directions for Morocco which had been published by the DMA and were updated as of March 14, 1970 with the latest available corrections. These Sailing Directions were designed to supplement the harbor chart and had been read by the watch officer. Also aboard was the well-known handbook for mariners, Bowditch, American Practical Navigator (1958 ed.), and a DMA approach chart.

## II.

We turn first to the district court's findings of fact upon which it concluded that the Potomac was negligent. Findings in this type of case "involve mixed questions of fact and law and are subject to more stringent appellate review than findings of fact covered by the 'clearly erroneous' test." Nye v. A/S D/S Svendborg, 501 F.2d 376, 380 (2 Cir. 1974), cert. denied, 421 U.S. 972 (1975). See Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776–78 (2 Cir.), cert. denied, 385 U.S. 835 (1966); Falletta v. Costa Armatori, 476 F.2d 316, 318 (2 Cir. 1973). Such findings, however, are entitled to great weight and will not be set aside unless they reflect a manifestly incorrect conception of the law on the part of the district court. In re Marine Sulphur Queen, 460 F.2d 89, 97–98 (2 Cir.), cert. denied, 409 U.S. 982 (1972); Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2 Cir. 1969). Measured by this standard, we shall consider the district court's essential findings with respect to the vessel's alleged negligence.

*Local Buoyage System*

█ Empire claims that the district court erred in finding that the Potomac was negligent in leaving buoy CA5 to port, i. e. in proceeding between the buoy and the visible end of the Jetee DeLure.[1] More specifically, the owner of the vessel argues that her navigators were correct upon entering Casablanca Harbor in leaving to port a black buoy[2] depicted as such on an American chart.

Under the American buoyage system, it would have been proper upon entering the harbor to leave a black buoy to port. But the Moroccan buoyage system in 1972 was just the opposite: it required that a black buoy be left to starboard upon entering a harbor.

Charts show the colors of buoys, but not the applicable buoyage system. It is common knowledge among mariners that different buoyage systems are used around the world. Bowditch states that "[The American buoyage system] does not always apply to foreign waters".

Captain Hansen, the Potomac's master, knew that in most European countries, including France, the applicable buoyage system called for leaving a black buoy to starboard upon entering a harbor. He knew that Morocco had been a French colony. But although he and his watch officer, Hunziker, had never put in to Casablanca Harbor before the day of the stranding, neither attempted to find out what buoyage system applied.

There was evidence that the Potomac's course originally had been shaped up with CA5 fine on the starboard bow. Hunziker testified that initially they intended to leave CA5 to starboard. And there was evidence that Hansen had erased and rewritten certain of the ship's records which had indicated the course originally intended with respect to CA5. This and other matters of credibility of course were peculiarly within the province of the trial court. *Interocean Shipping Co.* v. *National Shipping and Trading Corp.*, 523 F.2d 527 (2 Cir. 1975); *In the Matter of Grace Line Inc.*, 517 F.2d 404 (2 Cir. 1975); *Kulukundis Shipping Co.* v. *Amtorg Trading Corp.*, 126 F.2d 978, 980 (2 Cir. 1942).

Hansen and Hunziker, moreover, readily could have ascertained the buoyage system for Casablanca Harbor by consulting the pilot charts which showed the buoyage systems for various countries, including France and Morocco. Such charts were aboard the Potomac. All else aside, the applicable buoyage system could have been determined very easily by contacting the pilot station by radio telephone. But the Potomac failed to do so.

We hold that the district court clearly was correct in finding that the Potomac's master and watch officer were negligent in failing to ascertain and to heed the buoyage system for Casablanca Harbor, and that such negligence was a proximate cause of the stranding.

1. Empire asserts that the Potomac's change of course was necessary to avoid a collision with an outbound vessel. This explanation for the change of course does not diminish Empire's problem of proof. If the course could have been changed again to avoid the area where the Potomac stranded, Empire still would have to prove that the vessel's failure to make the additional change of course was due to the government's negligence and not solely to the Potomac's own negligence.

There was no showing by Empire that the stranding was unavoidable once the course initially had been changed. This is not surprising. Such a showing would have defeated Empire's claims against the government. The efforts to avoid a collision would constitute a superseding cause of the stranding, thus re-

lieving the government (even on Empire's theory) of liability for negligence on its part.

2. CA5 was a black buoy. It is described as follows in the Sailing Directions applicable to Casablanca Harbor:

"A lighted whistle buoy, equipped with a radar reflector, is moored close off the seaward extremity of the submerged section of the breakwater forming the outer portion of Jetee DeLure."

The master of the Potomac, Captain Hansen, testified that he understood CA5 to be the buoy thus described in the Sailing Directions. It was indicated as a black buoy on the harbor chart and the approach chart, both of which were on board the Potomac.

*Harbor Pilot*

■ The Potomac also was negligent in failing to take aboard a harbor pilot to guide her into the harbor.

Such pilotage was compulsory in the area where the stranding occurred. The Potomac was proceeding generally on a southerly course in entering the harbor. The DMA's Sailing Directions which had been read by Hunziker state that pilotage is compulsory south of 33° 37' 40" north latitude.[3]

Moreover, the Potomac ignored specific instructions by cable and radio telephone to keep in contact with the pilot station and to await a pilot before entering the harbor. Such instructions were sent on the day of the stranding at 1103 hours, at 1310 hours and at 1515 hours. The stranding occurred at 1550 hours. Particularly in view of the fact that both the master and the watch officer of the Potomac were unfamiliar with the harbor, such pilotage directions and specific instructions should have been strictly observed. The Potomac should not have continued south of the parallel into the harbor without a pilot.[4]

We hold that the district court correctly found that the Potomac was negligent in failing to have a harbor pilot aboard to guide her into the harbor, and that such negligence was a proximate cause of the stranding.

*Charts and Sailing Directions*

■ The Potomac also was negligent in the manner in which her master and watch officer used or disregarded the charts and Sailing Directions which were aboard.

There were three charts aboard of varying degrees of relevance in approaching Casablanca Harbor:

(1) Approach chart (No. 51220).

(2) Harbor chart (No. 51222).

(3) Ocean depth curve chart (No. 51013).

The approach chart showed among other things the approach to Casablanca Harbor along the line of buoys CA1 (3 miles out from the inner harbor), CA3 (1.5 miles out), and CA5 (at the entrance to the harbor). This chart showed the entrance range course starting north and to the east at 228 degrees true, and then entering the harbor south and east of buoy CA5.

The harbor chart, which was on a larger scale than the approach chart, did not show buoys CA1 and CA3. It showed only buoy CA5 and the entrance range course of 228 degrees true.

The ocean depth curve chart was on a much smaller scale than either the approach chart or the harbor chart. It showed the northwest coast of Africa in general, but nothing about the approaches to Casablanca Harbor. It did not show any of the approach buoys, nor the entrance range.

Of these three charts, only the harbor chart and the ocean depth curve chart were used by Hansen and Hunziker. They did *not* use the approach chart, although it was aboard.

The district court found that ordinarily prudent navigators of United States flag ships in 1972 commonly used the approach chart and the harbor chart in entering Casablanca Harbor. The court emphasized the significance of the failure of the Potomac's navigators to use the approach chart since this was believed to be the preferable chart of the three aboard for prudent navigation into Casablanca Harbor.[5]

3. This information to mariners was based on the Moroccan Vizerial Order of February 20, 1967 governing pilotage in Casablanca Harbor for vessels such as the Potomac.

4. The fact that a marine telegram received by the Potomac from the Empire agent in Casablanca referred to a pilot boarding at buoy CA5 does not help Empire. In view of the

pilotage requirements, this simply indicated approximately where along the parallel the vessel should have awaited the pilot. It did not justify leaving the buoy to port and proceeding south into the harbor.

5. Whether the district court may have overemphasized the significance of the navigators' disregard of the approach chart is unnecessary

More significant was their disregard of the reference in the Sailing Directions to "the outer extremity of the breakwater [being] submerged for a distance of 400 yards". This reference, read in conjunction with the notation on the harbor chart of "work in progress" at the end of the breakwater, most assuredly should have warned a prudent navigator against proceeding between the breakwater and CA5.[6] And yet neither Hansen nor Hunziker had plotted on the chart the 400 yard submerged section of the breakwater. Hansen admitted, "If I had stepped off and noticed the extension was 400 yards I wouldn't have gone in . . . ." To admit this is to acknowledge the obvious. The point where the Potomac stranded was barely 100 yards east of the outer extremity of the 400 yard submerged section of the breakwater. To navigate a 75 foot beam vessel through a 100 yard clearance is hardly prudent navigation. Furthermore, all other navigation aids aside, few rules of navigation are more elemental than the prohibition against passing between a buoy close off the end of a breakwater and the breakwater itself.

We hold that the district court correctly found that the Potomac was negligent in the manner in which her master and watch officer used or disregarded the charts and Sailing Directions which were aboard, and that such negligence was a proximate cause of the stranding.

*Speed*

■ The district court's finding that the Potomac was negligent in approaching the harbor at an excessive speed presents a closer question.

In fairness to appellant, our careful review of the record indicates that the district court's finding that "at the time of grounding, the vessel was proceeding at a speed equivalent to nine knots on the ground" probably was erroneous. This speed computation appears to have been based on incorrect tonnage figures.

On the other hand, in fairness to the district court, its essential finding with respect to speed was that the master "approached the northwest corner of Casablanca Port at a speed which was certainly in excess of what one would have expected for a navigator unused to local conditions." This finding strikes us as correct, having in mind the absence of a harbor pilot aboard the Potomac, her navigators' unfamiliarity with the local buoyage system, their disregard of critical charts and Sailing Directions which were aboard, and the presence of an outbound vessel, local sailboats and anchored vessels in the area of the breakwater.

Moreover, under our view of the case as a whole, the finding with respect to speed was of minimal importance. As we have stated above, the evidence of negligence on the part of the Potomac in other respects was so overwhelming that any error by the district court in the computation of speed was immaterial.[7]

### III.

We turn next to the district court's findings of fact upon which it concluded that the stranding of the Potomac was not caused by the alleged failure of the DMA to indicate on certain of its navigational aids the extension of the jetty

for us to determine. In our view, the evidence of the Potomac's negligence was so overwhelming that emphasis by the district court on one factor over another is immaterial.

6. Empire argues that the Potomac's navigators were justified in ignoring the Sailing Directions since they predated the harbor chart as corrected. This argument ignores the fact that the Sailing Directions were designed to supplement the chart and were to be read in conjunction with it. Particularly in a situation where the harbor was unfamiliar to the ship's

navigators, the applicable buoyage system had not been determined, the compulsory pilotage area had been entered without a pilot, and the harbor chart indicated work in progress off the breakwater, close adherence to the Sailing Directions should have been the order of the day.

7. Indeed appellant states, "Whether Potomac was proceeding at 2 knots or 9 knots is irrelevant . . . . If she had proceeded on the same course at 2 knots she would have stranded in the same place." We agree.

in the direction of CA5 and the presence of underwater obstructions where the Potomac stranded. The essential findings on this aspect of the case focus on the latest changes in the Sailing Directions prior to the stranding and in the Notice to Mariners referred to in the harbor chart.

*Sailing Directions*

Empire does not contend that the DMA was negligent in its revision of the harbor chart in 1966. Rather, it claims that the DMA was negligent in 1970 when it revised the Sailing Directions with Change 13—the last revisions before the stranding occurred. At that time, according to Empire, the DMA had information on the basis of which it should have included additional warnings against passage between buoy CA5 and the Jetee DeLure.

The United States has never surveyed Casablanca Harbor. The DMA and its predecessors traditionally have relied upon charts prepared by French and English hydrographers and cartographers in order to publish American charts of North Africa since Morocco does not publish navigation charts or sailing directions. The American charts here involved state on their face that they are based on foreign charts or surveys. The harbor chart, for example, states that it is "from French surveys to 1920 with additions from a French chart of 1955."

When Change 13 revised the Sailing Directions here involved as of March 14, 1970, Rolf D. Anderson was the DMA's specialist in charge of reviewing the information on hand about Casablanca Harbor to determine what changes, if any, were necessary in the DMA's publications. He had in his possession at that time a 1955 French chart, No. 5697; 1959 French Sailing Corrections (C–IV, corrected to Supplement 5, 1968); and Les Guides des Ports, commonly referred to as the French handbook. Anderson did not have in his possession French chart No. 5697 corrected to June 1971 which showed that the jetty had been extended further than indicated on the DMA harbor chart. Nor had Anderson received at that time French Sailing Directions (subsequently issued) which stated that buoy CA5 marked the end of the jetty construction area and that passage between the jetty and the buoy was forbidden.

■ Neither the 1955 French chart nor the French Sailing Corrections indicated the need for additional warnings against passage between the buoy and the jetty. The only indication that the submerged area of the jetty extended as far as the point where the Potomac stranded was information in the French handbook. This was an unofficial publication privately printed. Understandably, it was accorded less weight than an official publication. The DMA would not have been justified in changing its publications on the basis of an unofficial publication which was at variance with its charts. It was necessary to evaluate such information in the light of other available information to the contrary. For example, the Roches Noires light in Casablanca Harbor which was operated by the local authorities included a red sector which marked dangerous areas in the harbor. The areas of danger indicated by the light did not encompass the underwater portion of the jetty to the extent described by the French handbook, nor did it include the area where the Potomac stranded. Anderson considered the lack of evidence in official documents of a submerged area out to the point where the Potomac stranded as a further indication that the information in the French handbook was unreliable. On the other hand, he thought that such information should not be totally ignored. He therefore inserted in the Sailing Directions, in addition to the statements that the breakwater extended out two miles and that the buoy was close off the seaward extremity of the submerged section of the breakwater, the reference to "the outer extremity of the breakwater [being] submerged for a distance of 400 yards". The 400 yard distance included that portion of the sub-

merged area which fell within the red sector of Roches Noires light. To the extent therefore that there was corroboration by an official source that information in the handbook was reliable, it was reflected in the Sailing Directions. Corroborating information received by the DMA prior to publication of Change 13 was not in itself sufficient, however, to have warranted additional warnings against passage between the buoy and the jetty. While such a statement of course could have been included, the statements that did appear in the Sailing Directions we believe were sufficient to convey the same warning to a reasonably prudent mariner.

We hold that the district court was correct in finding that the DMA was not negligent in not including in its 1970 revisions of the Sailing Directions additional warnings against passing between the buoy and the jetty.

*Notice to Mariners*

Empire also contends that the DMA was negligent in failing subsequently to include in its Notice to Mariners issued in December 1971 a statement correcting the harbor chart. Such correction, according to Empire, was required by information in DMA's possession at that time which indicated that the jetty extended further than the harbor chart showed.

After Change 13 in the Sailing Directions had been issued, the DMA received additional information, principally the French Sailing Directions and French chart No. 5697 corrected to June 1971. On the basis of this additional information, the DMA might have made a subsequent change in its own Sailing Directions by adopting the language of the French Sailing Directions which specifically stated that passage between the buoy and the jetty was forbidden. The French Sailing Directions, however, contained no essentially different information with respect to the jetty than that already disclosed in the DMA's Sailing Directions.

Empire's claim that the DMA was negligent in failing to take into account information which came into its possession after issuance of the change in the Sailing Directions is based largely on the fact that the DMA received the French chart corrected to June 1971 prior to issuing its December 1971 Notice to Mariners. The French chart showed that the submerged portion of the jetty extended some 400 yards from its visible end, rather than 250 yards from the visible end shown on the DMA harbor chart.

We believe that the record provides adequate support for the district court's finding that the DMA was not negligent in not including in its Notice to Mariners in December 1971 a correction of its harbor chart to conform to the French chart. The reference in the DMA Sailing Directions to the 400 yard submerged extremity of the breakwater, as the district court appropriately emphasized, is the short answer to Empire's claim in this respect. In addition, there was an abundance of evidence, much of which has been summarized above, that, regardless of the length of the submerged extremity of the breakwater, it was gross negligence for the Potomac to have left black buoy CA5 to port and to have attempted to pass between it and the jetty. Any prudent mariner, reading the harbor chart and Sailing Directions together, most certainly never would have permitted his vessel to get to where the Potomac stranded.

Moreover, a diver testified that the submerged portion of the jetty extended only 250–300 yards beyond the section that was visible in 1971 and 1972, not 400 yards as indicated on the French chart. If the diver's testimony is to be credited as apparently it was, the DMA would have been in error if it had changed its own chart to conform to the French chart.

The diver also testified that the Potomac stranded, not on a submerged portion of the jetty, but rather on two large, submerged concrete blocks about 100 yards beyond the end of the submerged portion of the jetty. For aught

that appears in the record before us, the presence of these blocks was not known to anyone at the time of the stranding. None of the charts or official navigation aids made any reference to these obstructions. They did not form part of the submerged portion of the jetty. The DMA surely was not negligent in failing to note such underwater obstructions in its Notice to Mariners when the obstructions were unknown and not readily ascertainable at the time the Notice was issued.

We hold upon the entire record that the district court correctly concluded that the sole cause of the stranding of the Potomac was the negligence of her master and watch officer in approaching Casablanca Harbor, and not the result of any negligence on the part of the DMA.

Affirmed.