Weisburgh v. NH Savings Bank Corp.   CV-90-227-B   09/30/93

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Jeffrey Weisburgh, on behalf of himself
and all those similarly situated,
Edward C. Taylor, and Maurice B. Emond

   v.                                              Civ. No. 90-227-B

New Hampshire Savings Bank Corp., et al


**O R D E R**


Plaintiffs bring this securities fraud action on behalf of themselves and all other persons who purchased New Hampshire Savings Bank Corp. ("NHSBC") common stock between January 30, 1989 and April 3, 1990.  Plaintiffs allege that during this period, defendant NHSBC and several of its officers and directors artificially inflated the market price of NHSBC's common stock by engaging in a common course of conduct designed to publicly misrepresent NHSBC's financial condition and future prospects. Plaintiffs base their claims for relief on §§10(b) and 20 of the Securities and Exchange Act of 1934, 15 U.S.C.A. §§ 77(b)-78(h), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, as well as on the common law of negligent misrepresentation.

Presently before me is plaintiffs' motion for class certification pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

At some point prior to January 30, 1989, NHSBC's loan portfolio began to rapidly deteriorate. Failing commercial construction projects and the collapse of the New Hampshire real estate market had begun to take their toll. Plaintiffs allege that NHSBC should have immediately disclosed that its portfolio was deteriorating, established adequate loan and credit loss reserves, and written-off non-collectible loans. NHSBC, however, did not correct these problems. Instead, on January 30, 1989, when the bank announced its earnings per share, it also announced a $6 million addition to its fourth quarter 1988 loan loss reserves that wrongly led prospective investors to believe that the bank had established adequate reserves to meet the challenges NHSBC was facing.

Plaintiffs allege that in the following sixteen months, defendants continued to misrepresent NHSBC's true condition in a series of Annual Reports, Quarterly Reports, filings with the SEC, press releases and public statements. While these

disclosures revealed additional problems at NHSBC, plaintiffs assert that each disclosure also led investors to mistakenly believe that past problems had been addressed and that NHSBC had now conservatively provided for the risk of future write-offs and loan losses. According to plaintiffs, such misstatements and omissions were material and misleading. In addition, the inadequate loss provisions NHSBC detailed also caused its income and assets to be materially misstated throughout the period. Plaintiffs contend that the fraud finally ended on April 3, 1990, when NHSBC issued a press release announcing revised fourth quarter and year-end 1989 results. The revised 1989 results reflected a $68.8 million loss for the year. In this press release, NHSBC also revealed that its auditors would issue a "going concern" opinion and that the bank would be forced to enter into a Cease and Desist Order with federal regulators.[1] Over the course of the period, defendants' announcements had a devastating effect on NHSBC's stock price. On January 30, 1989, NHSBC stock traded at $11.00 per share. After the Company's

---

[1] Plaintiffs also allege that during the period defendants failed to disclose that federal and state regulators had criticized NHSBC's loan practices and loan loss reserves. These regulators had also imposed restrictions on NHSBC that severely impaired its liquidity and operational flexibility.

3

April 3, 1990 release, the stock traded at $1.12.

On May 5, 1990, plaintiffs filed a class action complaint stating their federal securities law and state law claims.[2] On September 14, 1990, plaintiffs moved for certification of the class pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs defined the proposed class as consisting of "[a]ll purchasers of New Hampshire Saving Bank common stock during the period January 30, 1989 through April 3, 1990 (inclusive)." Jeffrey Weisburgh, Edward Taylor and Maurice Emond were proposed as class representatives. Defendants opposed certification of plaintiffs' federal securities claims on the grounds that the named plaintiffs were atypical and inadequate representatives and lacked standing to assert the claims of certain members of the proposed class. Defendants also argued that plaintiffs' state law claims could not be certified because questions of individual reliance would predominate over questions common to the class. After almost three years of procedural disputes, a hearing was held on September 9, 1993. I now grant

_____

[2] Jeffrey Weisburgh was the only named class representative when the class action complaint was filed. Named plaintiffs Edward Taylor and Maurice Emond were added by amending the original complaint. For convenience, I refer to plaintiffs in the plural throughout this order.

4

plaintiffs' motion as to their federal securities law claims and deny it as to their state law claims. Because Article III standing "is the threshold question in every federal case", <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975), I address this issue first.

## II. <u>STANDING</u>

Defendants raise two objections to named plaintiffs' standing to assert the claims of absent class members. First, defendants argue that because misrepresentations or omissions are only actionable under § 10(b) if plaintiffs relied upon them in purchasing NHSBC stock, the named plaintiffs lack standing to challenge alleged misrepresentations made <u>after</u> their last purchases. <u>Adair v. Sorenson</u>, 134 F.R.D. 13, 16 (D. Mass. 1991); <u>see</u> <u>also</u> <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 731, 737-38 (standing to bring a § 10(b) claim is limited to actual purchasers and sellers of securities), <u>reh'g denied</u>, 423 U.S. 884 (1975). Second, defendants argue that because the named plaintiffs purchased their stock after a revealing April 5, 1989 news release,[3] qualitative differences in available public

---

[3] In the April 5 release, NHSBC revealed both that it anticipated a large increase in its first quarter loan loss reserves and that it had taken title to the "Sky Meadow" project

5

information preclude them from representing investors who purchased before April 5. Only defendants' first argument presents an Article III issue. Defendants' second argument concerns the commonality and typicality of the class action claims. Thus, I address this argument in a subsequent section.

An individual's standing to sue and his right to represent a class are separate issues, one applicable to substantive claims and the other to procedural claims. United States Parole Comm'n v. Geraghty, 445 U.S. 388, 402 (1980). An individual's standing to sue hinges on her substantive claim: whether she has "a personal stake in the outcome of the controversy" and "whether the dispute 'touches upon the legal relations of parties having adverse legal interests.'" Flast v. Cohen, 392 U.S. 83, 100-101 (1968) (citations omitted). A class action is not a means to escape this requirement. Plaintiffs still must "allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent". Warth v. Seldin, 422 U.S. 490, 502 (1975). Thus, it is not sufficient for the representative plaintiffs merely to share attributes common

_____

which served as security for its largest non-performing loan.

6

to persons in the proposed class.  Id.  A plaintiff cannot acquire standing "through the back door of a class action". Allee v. Medrano, 416 U.S. 802, 829 (1974).

An individual's right to represent a class, in contrast, is a "procedural claim," the scope of which is defined by Rule 23. Geraghty, 445 U.S. at 402-04.  As the Supreme Court reasoned in Geraghty,

> The justifications that led to the development of the class action include the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims. Although the named representative receives certain benefits from the class nature of the action, some of which are regarded as desirable and others as less so, these benefits generally are byproducts of the class-action device.  In order to achieve the primary benefits of class suits, the Federal Rules of Civil Procedure give the proposed class representative the right to have a class certified if the requirements of the Rules are met.  This "right" is more analogous to the private attorney general concept that to the type of interest traditionally thought to satisfy the "personal stake" requirement.

Id. at 402-03 (citations and footnotes omitted); see also id. at 422-23 (Powell J., dissenting); Deposit Guaranty Nat. Bank v. Roper, 445 U.S. 326, 338-39, reh'g denied, 446 U.S. 947 (1980). Thus, a proposed plaintiff who has suffered the injury in fact necessary to give rise to a personal stake in the outcome of the

litigation has standing to represent any class that is certifiable under Rule 23.

In the present case, the named plaintiffs have satisfied the requirements of Article III by alleging sufficient injuries to demonstrate the requisite personal stake in the outcome of the case. They have alleged that defendants' common course of misrepresentations artificially inflated the market price of NHSBC stock and thereby caused them demonstrable, particular injuries. Whether the named plaintiffs may serve as representatives for class members who purchased stock after the named representatives made their final purchases thus will depend solely on whether the purported class satisfies the requirements of Rule 23.

### III. CERTIFICATION OF §10(b) CLAIMS UNDER RULE 23

Under Rule 23(a), plaintiffs bear the burden of showing that

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The first two prerequisites,

numerosity and commonality, require the named plaintiffs to show that an identifiable class exists.  The second two, typicality and adequacy, require these plaintiffs to show that they are appropriate representatives of this class.  See Advisory Committee Note, 39 F.R.D. 69, 100 (1966);  1 H. Newberg & A. Conte, Class Actions, §3.01 (3d ed. 1992).  If plaintiffs meet their burden under Rule 23(a), they must then demonstrate that the action satisfies Rule 23(b).  Because plaintiffs here move that the class be certified pursuant to Rule 23(b)(3), the action can only be maintained if: (i) questions of law or fact common to the class predominate over any questions affecting only individual members; and (ii) a class action is "superior to other available methods" of adjudicating the case.

A.   Standard of Review

Plaintiffs and defendants have spent much time and effort debating the standard of review I must use and the materials I may consider in determining whether the requirements of Rule 23 have been met.  Plaintiffs appear to support the standard used to evaluate a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In support of this position, they cite the Supreme Court's admonition that an inquiry into the merits of a claim is inappropriate prior to the resolution of the

9

class certification issue. <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 177-178 (1974). Defendants disagree and base their position on an apparently contradictory statement in another Supreme Court decision stating that a District Court must first conduct a "rigorous analysis" and, if necessary, look behind the pleadings to determine whether class certification is appropriate. <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 160-61 (1982). While neither party is entirely correct, the defendants' position more closely describes the standard against which I review plaintiffs' class certification motion.

It will generally not be necessary to look beyond a plaintiff's well pleaded complaint in determining whether the requirements of Rule 23 have been satisfied. However, where a defendant produces evidence calling into question one or more of the factual assertions upon which the plaintiff's certification motion rests, it is necessary to look beyond the pleadings and conduct a "searching inquiry" to determine whether plaintiff has met her burden under Rule 23. While this inquiry should not degenerate into a hearing on the merits, the court should not disregard facts that bear on the propriety of class certification simply because those facts are also relevant to the merits of the

plaintiff's claim.

With these principles in mind, I now turn to whether the named plaintiffs in this case have satisfied Rule 23(a)'s requirements of commonality, typicality and adequacy.[4]

B.   Commonality

Defendants challenge the named plaintiffs' standing to represent investors who purchased NHSBC stock before April 5, 1989.  On that date, NHSBC announced that it anticipated a substantial increase in loan loss reserves for the first quarter of 1989 and that it would take title to Sky Meadow, the security for its largest non-performing loan.  All of the named plaintiffs purchased after this announcement.  Defendants therefore argue that, because "the information in the market was qualitatively different after April 5," there can be no common questions of law or fact between plaintiffs and the pre-April 5 investors.

I disagree.  The threshold imposed by Rule 23(a)(2) is low: if one common legal or factual issue exists, the requirement is met.  Margaret Hall Foundation, Inc. v. Atlantic Financial

---

[4] Defendants do not dispute that plaintiffs have satisfied Rule 23(a)'s numerosity requirement, and I so find. Approximately 500 investors nationwide purchased 9 million shares of NHSBC stock during the proposed class period.  Joinder is therefore clearly impracticable.

11

Management, No. 82-2534-T, 1987 U.S. Dist. LEXIS 7528, at *6 (D. Mass. July 30, 1987).[5]  In this case, plaintiffs allege that, over a sixteen month period, defendants engaged in a common course of conduct designed to misrepresent NHSBC's financial position and future prospects to the investing public;  that this conduct artificially inflated the market price of NHSBC common stock; that, as a result, all purchasers of the stock during this period were damaged; and that defendants' conduct violated §10(b).  All members of the proposed class thus have to prove the same course of misrepresentation and omission, the materiality of this conduct, and defendants' scienter.  These common issues clearly exceed what is required by Rule 23(a)(2).  See, e.g., Abelson, 1987 U.S. Dist. LEXIS at *5; Kirby v. Cullinet Software, Inc., 116 F.R.D. 303, 306 (D. Mass. 1987) (amended, summ. judgment granted, in part, 721 F. Supp. 1444 (1989)).

_____

[5] As Judge Skinner noted, commonality is "largely irrelevant to motions brought under Rule 23(b)(3), where the moving party must establish not only the existence of common questions of law or fact, but that such common questions predominate over questions particular to individual class members." Abelson v. Strong, No. 85-05925, 1987 U.S. Dist. LEXIS 7515, at *5 (D. Mass. July 30, 1987).  Instead, the commonality requirement appears to be aimed at motions for certification brought under sections (b)(1) and (b)(2), which otherwise do not require that commonality exist.  Id.

To establish that the claims of named plaintiffs and of the pre-April 5 investors share no common issues of law or fact, defendants would have to show that the April 5 release marked the end of one fraudulent course of conduct and the beginning of another.  Cf., e.g., In re Endotronics (no number in original), 1988 U.S. Dist. LEXIS 745, at *16-17 (D. Minn. Jan. 24, 1988) (class period ended on date of "watershed" disclosure that revealed defendants' fraud);  In re Memorex Security Cases, 61 F.R.D. 88, 97 (N.D. Cal. 1973) (class period ended on date of disclosure that removed "alleged taint of earlier statements"); In Re LTV Securities Litigation, 88 F.R.D. 134, 147-48 (N.D. Tex. 1980) (same).  Defendants, however, argue merely that there was a qualitative difference between the information available before and after April 5.[6]  These contentions might affect damages, but as a matter of law, they are insufficient to establish that the periods before and after April 5 have no issues of law or fact in common.[7]

---

[6] Defendants' attack on named plaintiffs' Article III standing also involved concerns appropriately addressed to commonality.   For the same reasons discussed above, defendants arguments are insufficient as a matter of law.

[7] This ruling of course in no way prevents defendants from introducing evidence later in this proceeding that might prompt

13

C.   Typicality

Defendants also argue that the named plaintiffs are atypical because they are subject to unique defenses.  However, unique defenses do not enter into the certification analysis until the district court is called upon to determine whether questions common to the class predominate over those relating only to the individual representative plaintiffs.  I therefore address this contention at a later stage of my analysis.[8]

Rule 23(a)(3) focuses on whether the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Defendants' "unique defense" argument assumes that in referring to the "claims or defenses of the representative parties," section (a)(3) means the claims of or defenses against a representative plaintiff.  I disagree.

---

me to modify or change this order.  See Fed. R. Civ. P. 23(c)(1). Class certification orders are inherently tentative and can be changed at any time before determination of the merits of the case.  General Telephone, 457 U.S. at 160.

[8] To the extent that I may have suggested in a prior order that the presence of unique defenses may render a named representative's claims atypical, I was in error.  Because of the presumption of reliance that exists in fraud-on-the-market cases, unique non-reliance issues are similar to affirmative defenses and thus are more properly considered when determining whether the claims common to the class predominate over the claims of the individual class members.

14

Section (a)(3) must be construed in accordance with the Rule's earlier statement that a class member "may sue or be sued on behalf of all." In other words, Rule 23 applies to representative plaintiffs or defendants. When read in this light, "the claims or defenses of the representative parties" refers to "the claims of the representative plaintiff or the defenses of the representative defendant". See 1 H. Newberg & A. Conte, Class Actions, §3.16 (3d ed. 1992); Abelson, 1987 U.S. Dist. LEXIS at *8 n.4. This keeps the typicality requirement in line with the general purpose of Rule 23 -- "to limit the class claims to those fairly encompassed by the named plaintiffs' claims", General Telephone, 457 U.S. at 156 (citations omitted) -- without requiring an impermissible determination of the merits.

To be typical, plaintiffs must show that their "claim[s] arise from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." Moskowitz v. Lopp, 128 F.R.D. 624, 629 (E.D. Pa. 1989). In the present case, each class member's claim depends upon proof of the same course of conduct, the materiality of the conduct and defendants' scienter. The named plaintiffs' claims depend upon exactly the same showing. By presenting their claims, named

plaintiffs will therefore "necessarily present the claims of the absent plaintiffs". <u>Abelson</u>, 1987 U.S. Dist. LEXIS at *15. While I recognize that there are factual variations between plaintiffs' cases and those of other class members, Rule 23 looks for a common course of conduct, not for exact identity. <u>Priest v. Zayre Corp.</u>, 118 F.R.D. 552, 555 (D. Mass. 1988). If it were otherwise, certification motions could rarely be granted in fraud-on-the-market cases. "[T]he effectiveness of the securities laws [however] may depend in large measure on the application of the class action device". <u>Eisenberg v. Gagnon</u>, 766 F.2d 770, 785 (3d Cir.), <u>cert. denied sub nom. Wasserstrom v. Eisenberg</u>, 474 U.S. 946 (1985) (quoting <u>Kahan v. Rosensteil</u>, 424 F.2d 161, 169 (3rd Cir.), <u>cert. denied</u>, 398 U.S. 950 (1970)). Accordingly, I determine that the named plaintiffs' claims are typical of the claims of the class.

D. <u>Adequacy</u>

The final prerequisite imposed by Rule 23(a) is that the proposed representatives "fairly and adequately protect the interests of the class". Fed. R. Civ. P. 23(a)(4). This requirement is satisfied where the named plaintiffs demonstrate (1) that they are committed to vigorously prosecuting the action through qualified counsel; and (2) that their interests do not

16

antagonize or conflict with the interests of the class they represent.  <u>Andrews v. Bechtel Power Corp.</u>, 780 F.2d 124, 130 (1st Cir. 1985), <u>cert. denied</u>, 476 U.S. 1172 (1986).  Defendants do not contest plaintiffs' claim that they have shown their interests to be in harmony with those of absent class members, and I so find.  Defendants do, however, dispute plaintiffs' commitment to vigorously prosecute the action.[9]  Defendants argue that plaintiffs are inadequate representatives because their agreements with counsel absolve them of personal liability for all litigation costs, including expert witness fees.

Defendants' argument is unpersuasive.  The losses that the named plaintiffs sustained -- Weisburgh $1,700, Emond $10,000 and Taylor $22,000 --  give each a substantial incentive to remain involved in this litigation and ensure its vigorous prosecution.  Plaintiffs have also demonstrated their commitment to this litigation by appearing for depositions, answering

---

[9] Defendants do not dispute the qualifications and experience of plaintiffs' counsel.  Plaintiffs' counsel have attested that they are experienced in federal securities class action litigation.  Counsel has also vigorously prosecuted this action for over two years.

17

interrogatories and providing trading records.[10]  See Zaccoli v. Harrison, No. C-90-1006, slip op. at 13 (D.N.H. 1990).  In addition, plaintiffs' counsel have attested to their willingness to finance the costs of this litigation, including notice costs. Finally, plaintiffs' fee arrangements are also entirely consistent with New Hampshire's Rules of Professional Conduct. See New Hampshire Rule 1.8(e)(1) ("a lawyer may advance court costs and expenses of the litigant the payment of which may be contingent on the outcome of the matter").  Given the assurances that the above facts provide, I cannot see how personal liability for plaintiffs' minimal[11] share of any litigation costs would tip the balance between vigorous prosecution and inadequate representation.  I therefore find that named plaintiffs will

---

[10] Although defendants remark upon plaintiffs' failure to investigate the facts of this case, a plaintiff "need not have personal knowledge of all the relevant facts to be deemed adequate."  Priest, 118 F.R.D. at 556.  Parties oftentimes leave it up to their attorneys to conduct any necessary factual investigations.  This is clearly not a case where plaintiffs are "startlingly unfamiliar" with the action.  Greenspan v. Brassler, 78 F.R.D. 130, 133-34 (S.D.N.Y. 1978).

[11] If plaintiffs had agreed to remain personally liable for out-of-pocket litigation expenses, they would only have been liable for their pro rata share, i.e., their share of the costs after they were apportioned over the 9 million shares traded during the period.

adequately represent the interests of the absent class members.

E.    Predominance and Superiority

Because plaintiffs have satisfied the prerequisites set out in Rule 23(a), their class action may be maintained if (1) common questions of law or fact predominate over questions affecting only individual members, and (2) a class action is "superior to other available methods" of adjudicating the case. Fed. R. Civ. P. 23(b)(3).

Although defendants' "unique defense" arguments could not be considered in determining the typicality of plaintiffs' claims, these arguments can and should be considered in determining whether the proposed class action may be maintained. See Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975) cert. denied, 429 U.S. 816 (1976). Under Rule 23(b)(3), a district court may only certify a class action if questions common to the class predominate over "any questions affecting only individual members". Fed. R. Civ. P. 23(b)(3) (emphasis added). The Advisory Committee's Note to the Rule also suggests that unique defenses may be considered when engaging in a predominance analysis. In discussing section (b)(3) of Rule 23, the Committee stated that "a fraud case may be unsuited for treatment as a class action if there was material variation in the

19

<u>representations made or in the kinds or degrees of reliance</u> by the persons to whom they were addressed". 39 F.R.D. 69, 103 (1966) (emphasis added). The Committee also stated that a "mass accident" might be an inappropriate subject for a class action because "of the likelihood that significant questions, not only of damages but of liability and <u>defenses of liability</u> would be present, affecting the individuals in different ways". <u>Id.</u> (emphasis added). Finally, consideration of defendants' proposed defenses under Rule 23(b)(3) does not require that I decide the merits of this case. See <u>Blackie</u>, 524 F.2d at 905-08.

As defendants argue that all three proposed representatives are subject to unique defenses, I consider each representative in turn. After considering whether these defenses raise individual questions of fact or law, I go on to determine whether a class action is a superior means of adjudicating this dispute. See Fed. R. Civ. P. 23(b)(3).

### 1. <u>Weisburgh</u>

Defendants contend that Weisburgh is subject to the unique defense that he purchased in reliance on the integrity of his broker and not the integrity of the market. Weisburgh's PaineWebber broker was his sole source of information about NHSBC. Shortly before speaking with Weisburgh, the broker read a

20

PaineWebber report which predicted, based on new economic data, that NHSBC would experience the very problems that plaintiffs allege defendants were hiding from the public at that time: that NHSBC's problem loans would double and that the bank would probably experience capital reserve and regulatory capital problems down the line. The report therefore downgraded NHSBC stock from "attractive" to "neutral." When he met with Weisburgh, the broker mentioned the downgrade but did not, or does not remember, discussing all of the report's negative projections. Moreover, the broker continued to believe that NHSBC's fundamentals remained sound. After considering both his broker's recommendation and the stock's price, Weisburgh made his purchase. At his deposition, however, Weisburgh testified that he did not know whether he would have purchased the stock if he had known all of the negatives contained in the report.

Defendants contend that the broker "misled" Weisburgh into believing that the investment was not risky because he did not "accurately convey" the "important publicly available cautionary information" contained in the report. Defendants argue that Weisburgh therefore did not rely on "publicly available information, i.e., the integrity of the market," in purchasing NHSBC stock, but on information from a private source -- his

21

broker.[12]  Defendants then conclude that this failure of reliance is fatal to Weisburgh's fraud-on-the-market § 10(b) claim.

I disagree.  First, defendants stretch the facts beyond their breaking point to argue that the broker "misled" Weisburgh.  The broker presented a brief overview of his impressions and then advised Weisburgh that NHSBC appeared to be a good investment.  In other words, the broker was conveying his analysis of available investment information.  The fraud-on-the-market doctrine does not require investors to rely on primary source materials.  See Kirby, 116 F.R.D. at 307;  Grace v. Perception Technology Corp., 128 F.R.D. 165, 168 (D. Mass. 1989); Priest, 118 F.R.D. at 555.  As another court in this circuit has remarked,

> There will always be some individuals who read the financial statements directly, others who read secondary analyses such as Moody's or Value Line, and many others who relied on the advice of stockbrokers or friends.  If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers.

_____

[12] Defendants also assert that Weisburgh "ignored" explicit warnings of the very problems that he alleges defendants concealed. This argument has no merit.  In the same breath defendants argue that Weisburgh had no knowledge of these warnings.

<u>Priest</u>, 118 F.R.D. at 554-55 (quoting <u>In re Data Access Systems Security Regulation</u>, 103 F.R.D. 130, 139 (D.N.J. 1984)).

Second, even if the broker misled Weisburgh into thinking that NHSBC stock was not a risky investment, defendants do not contradict Weisburgh's sworn statement that price was an important factor influencing his decision to buy. As long as price was a "significant contributing" cause of Weisburgh's decision, <u>see</u> <u>Wilson v. Comtech Telecommunications Corp.</u>, 648 F.2d 88, 91 (2d Cir. 1981), defendants can only assert an arguable reliance defense by showing that Weisburgh bought the stock even though he knew or should have known that the stock had been subject to manipulation. <u>See</u> <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 248 (1988).

Contrary to the premise underlying defendants' argument, Weisburgh's reliance on the integrity of the stock's market price cannot be rebutted merely by showing that he failed to become aware of public, non-fraudulent information that might have dissuaded him from making his purchase. This premise mistakenly assumes that Weisburgh's reliance on publicly available information provides the requisite causal link between his financial losses and defendants' alleged fraudulent conduct. In a fraud-on-the-market case, however, this is simply incorrect --

23

the causal link is supplied by plaintiffs' reliance on the market price being free from manipulation.  Id. at 241-47.  In essence, the theory recognizes that modern securities markets have interposed themselves between buyers and sellers, making face to face transactions virtually nonexistent.  Id. at 241-42, 244.  The markets have not, however, completely severed the link between buyers and sellers.  Instead, the markets have become "the unpaid agent[s] of the investor[s], informing [them] that given all information available to it, the value of the stock is worth the market price."  Id. at 244 (quoting LTV, 88 F.R.D. at 143).  As a result, reliance in a fraud-on-the-market case is established by demonstrating that the buyer relied on the market's pricing of the seller's public disclosure.  Because market price supplies the link between defendants' fraud and plaintiffs' injuries, defendants cannot sever this link merely by showing that Weisburgh did not directly rely on the information that the market used to set the price of NHSBC stock.  Instead, defendants can only sever this causal link by severing "the link between the alleged misrepresentation ... and his decision to trade at a fair market price."  Id. at 248 (emphasis added).  As defendants have not made such a showing, I find that the unique reliance defense they assert against Weisburgh is not an arguable

24

defense and so does not present an individual question for Rule 23 purposes.

2. <u>Taylor</u>

Defendants contend that Taylor is subject to three unique defenses. First, defendants argue that Taylor is subject to a unique non-reliance defense because he more than doubled his holdings of NHSBC stock after he knew of the company's losses and of this lawsuit. In other words, defendants ask that I infer from these post class-period purchases that Taylor would have bought stock during the period even if he had known that the stock was artificially overpriced. In urging me to pursue this course, however, defendants ignore the most obvious inference to be drawn from these purchases -- that Taylor believed the stock had bottomed out and that, if he bought at this price, he might later recoup the losses he incurred by buying NHSBC stock at an artificially inflated price. My purpose in mentioning this alternative is not to show that defendants' inference is necessarily wrong, but that it is extremely speculative. It is this speculativeness that prevents the inference from rebutting Taylor's presumed reliance on the integrity of the stock's market price. In upholding the validity of this presumption, the Supreme Court stated:

25

> "[r]equiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed or if the misrepresentations had not been made, would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market."

Basic, 485 U.S. at 245 (citations omitted).  This logic would be turned on its head if the presumption of reliance could be rebutted by speculating as to the inferences that could conceivably be drawn from certain facts.  Moreover, it would largely preclude use of the class action device in a fraud-on-the-market case, thereby rendering it much more difficult to privately enforce federal securities laws.  For these reasons, I conclude that defendants' first "unique defense" is insufficient to create an individual question within the meaning of Rule 23.

Defendants allege that Taylor is subject to a second unique defense because he engaged in an "averaging out" investment strategy when he purchased his shares in NHSBC.  To support their allegations, defendants point to three facts:  (1) that Taylor had previously admitted to having successfully used this strategy with another stock; (2) that Taylor thought NHSBC stock was undervalued when he bought it during the period; and (3) that Taylor doubled his holdings after the proposed class period ended, halving his average cost per share.  From these facts,

26

defendants ask that I infer that when Taylor purchased NHSBC stock during the class period, he was buying into NHSBC's decline in the hopes that the market would turn around.

"[A]n investment strategy [however] is of little importance to ... suitability as a class representative". Randle v. Spectran, Fed. Sec. L. Rep. para. 95,167, 94,637 (quoting Kirby, 116 F.R.D. at 308). Investors

> may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspecting manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price.

Blackie, 524 F.2d at 907. Moreover, as with defendants' first argument, there could be many reasons for Taylor's purchases during and after the class period.[13] For the same reasons, the logic of Basic also precludes me from indulging in such speculation.

Finally, defendants allege that Taylor is subject to the unique defense that he recklessly failed to investigate his

---

[13] Taylor's post-period purchases, for example, would be entirely justified as an attempt to average down to perhaps recoup the losses he incurred by buying NHSBC stock at an artificially inflated price. This would not indicate that Taylor averaged down when he bought stock during the class period.

investment in NHSBC.  Taylor first purchased NHSBC stock approximately two weeks after NHSBC announced that it anticipated a substantial increase in loan loss reserves and that it was going to take title to its biggest non-performing loan, the Sky Meadow project.  The Portsmouth Herald, the paper to which Taylor subscribed, ran the story five days before his purchase.  However, Taylor did not know about the article and thus did not read it.  Defendants contend that Taylor was reckless because he possessed the paper when he purchased NHSBC stock and admits that he would not have made the purchase had he read the article.

This argument has no merit.  This is not a case where an investor has recklessly closed his eyes to the falsity, or probably falsity, of a particular piece of public information.  See Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp., 910 F.2d 1540, 1546 (7th Cir. 1990).  Instead, defendants allege that Taylor was recklessly unaware of public, non-fraudulent information that might have prompted him not to buy NHSBC stock.  As outlined above in discussing the unique defense asserted against Weisburgh, Taylor is presumed to have known and relied on such information because he relied on the stock's market price when deciding to make his purchase.  Moreover, § 10(b) does not require that plaintiffs inform themselves about their

28

investments.  The obligations imposed by the statute "rest with the speaker, not the listener".  <u>Id.</u>  As Judge Easterbrook stated,

> The first question for the legal system is whether to create a duty to disclose information truthfully.  Such a duty, if created, rests on the proposition that the information ought to come out, and that people ought not be left to their own investigative talents.  Once the duty to disclose exists, and lying or nondisclosure is condemned as an intentional tort, it no longer matters whether the buyer conducts an investigation well or at all.

<u>Teamsters Local 282 Pension Trust Fund v. Angelos</u>,  762 F.2d 522, 528 (7th Cir. 1985).  "This is just another way of saying that contributory negligence is not a defense to an intentional or reckless tort."  <u>Id.</u>

    3.  <u>Emond</u>

Defendants "unique defense" against Emond is virtually identical to the recklessness defense asserted against Taylor. Defendants assert that Emond subscribed to the <u>Concord Monitor</u>, which ran an article on May 2, 1989 reporting that NHSBC was "stuck" with the $22 million Sky Meadow project and that it would be increasing its loan loss reserves by $3.7 million.  Emond purchased his shares of NHSBC six days later.  He did not read the article, and does not know whether he would have purchased the stock if he had.  Defendants contend that Emond is therefore

29

subject to the unique defense that he "recklessly failed to investigate information in his possession concerning NHSBC". For the reasons described above when discussing the applicability of this defense to Taylor, I find this argument equally meritless.

As I find as a matter of law that none of the "unique defenses" defendants assert arguably raise individual questions concerning Weisburgh, Taylor and Emond, I conclude that the common issues of law and fact detailed in earlier portions of this opinion predominate.[14] I also find that because the class is so large and the common issues so prevalent, the class action mechanism is the superior means of adjudicating plaintiffs' § 10(b) claims.


## IV.   PENDANT STATE CLAIMS

In addition to their § 10(b) claims, plaintiffs ask that I certify their state law negligent misrepresentation claims. Plaintiffs argue that certification is appropriate because all class members were injured by defendants' common course of

---

[14] Even if defendants' arguments did raise questions about any of the named plaintiffs' reliance, separate trials could be held on these particular issues. See In Re AM Int'l., Inc. Sec. Litigation, 108 F.R.D. 190, 194 (S.D.N.Y. 1985) (and cases cited therein).

30

conduct, members' proof of this conduct will be the same, and common issues therefore predominate over any questions relating to individual class members.  Plaintiffs also argue that New Hampshire law can be applied to the misrepresentation claims, thus avoiding the individual questions that might arise if the laws of the members' respective states must be applied. Defendants do not dispute plaintiffs' contention that New Hampshire law will apply. Instead, they argue that the lack of a state law fraud-on-the-market theory will cause questions of individual reliance to predominate over questions common to the class.[15]

Defendants have the better argument on this point.  Although several federal courts have remarked that the recent trend is toward certification of pendant securities claims,[16] I believe that questions of individual reliance would predominate if certification were granted.  As the Supreme Court stated in Basic,

---

[15] Because I find that common issues will not predominate, I assume, arguendo, that the prerequisites set out in Rule 23(a) have been met.

[16] E.g., Priest, 118 F.R.D. at 557; Peil v. Speiser, 806 F.2d 1154, 1159 n.8 (3d Cir. 1986).

> Requiring proof of individualized reliance from each
> member of the proposed plaintiff class effectively
> would have prevented respondents from proceeding with a
> class action, since individual questions then would
> have overwhelmed the common ones.

485 U.S. at 242. Plaintiffs have not supplied a satisfactory answer as to how this problem may be overcome. I agree with Chief Judge Carter that, "[w]hereas that problem is resolved in the federal securities law context by resort to the fraud-on-the-market presumption of reliance, it does not appear that a similar presumption is available with respect to Plaintiffs' state law fraud and negligent misrepresentation claims". In Re One Bancorp Sec. Litigation, 136 F.R.D. 526, 533 (D. Me. 1991).

I also disagree with plaintiffs' suggestion that it is appropriate for me to establish such a presumption where none existed before. Novel questions of state law should be decided by state courts. Carlton v. Worcester Ins. Co., 923 F.2d 1, 3 (1st Cir. 1990); Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 744 (1st Cir. 1990); Porter v. Nutter, 913 F.2d 37, 40-41 (1st Cir. 1990); Taylor v. Aetna Casualty & Surety Co., 867 F.2d 705, 706 (1st Cir. 1989) (per curiam).

32

## V.  CONCLUSION

Regarding plaintiffs' claims under § 10(b),  I find that the named plaintiffs have standing to represent the proposed class and that they have satisfied the prerequisites to a class action set out in Rule 23(a)(1)-(4).  I also find that a class action may be maintained under Rule 23(b)(3).  I therefore order that plaintiffs' federal securities law claims be certified as a class action; that Weisburgh, Taylor and Emond be the named plaintiffs; and that the class period extend from January 30, 1989 to April 3, 1990.  With regard to plaintiffs' state claims for negligent misrepresentation, I find that questions of individual reliance will predominate over questions common to the class.  I therefore deny plaintiffs' certification motion (document no. 94) with respect to these claims.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

September 30, 1993
cc:  Glen DeValerio, Esq.
     Stephen Whinston, Esq.
     Dennis Johnson, Esq.
     Kenneth Bouchard, Esq.
     Thomas Dougherty, Esq.
     John Broderick, Esq.
     Christopher Reid, Esq.